Margaret Hughes, Administratrix of the Estate of David E. Hughes, Appellant, v. Community Bank of Dawn.—78 S. W. (2d) 98.

Division Two, January 7, 1935.*

▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉

---

*NOTE: Opinion filed at May Term, 1934, June 19, 1934; motion for rehearing overruled December 1, 1934; motion to transfer to Court en Banc filed; motion overruled at September Term, January 7, 1935.

*Davis & Ashby* for appellant.

*Chapman & Chapman* for respondent.

COOLEY,. C.—This case, coming to the writer on reassignment, is a suit for conversion of a certificate of deposit. Defendant denied the alleged conversion and asserted a lien on the certificate. which it sought to have foreclosed. The circuit court rendered judgment for defendant, from which the plaintiff appealed. Plaintiff sues

as administratrix of the estate of her deceased husband, David E. Hughes, who died about November 15, 1924. Her petition alleges in substance that on June 16, 1924, her decedent deposited in defendant bank $9000 on time deposit, for one year, receiving from the bank a certificate of deposit for the amount, drawing interest at five per cent per annum; that decedent at the time of his death was the owner and entitled to possession thereof; that she, as his administratrix, had demanded same of the bank, which demand had been refused, and that the bank wrongfully withheld same from her and had converted it to its own use. Judgment is prayed for said sum of $9000 and interest at five per cent per annum from June 16, 1924.

By its answer the bank admitted the deposit by Hughes and the issuance by it to him of the certificate of deposit and pleaded that on September 29, 1924, said Hughes, under the name of D. E. Hughes. together with one Herbert Hughes, had executed to the bank a note for $9000 and as collateral security therefor David E. Hughes had endorsed and pledged to the bank the said certificate of deposit; that the note was past due and remained unpaid; and that the bank held and was entitled to hold said certificate as such security. By way of counterclaim or cross-action the bank pleaded the execution of the note by Hughes and the pledging of the certificate as collateral security therefor, that the bank thereby became entitled to and had a lien on said certificate and the money it represented to secure the payment of the note and prayed judgment for the amount of the note and interest, that same be decreed to be a lien on the certificate and the "funds represented thereby," that the plaintiff's equity of redemption be foreclosed, for an order of sale of the collateral and application of the proceeds to payment of the debt due the bank and for such other and further relief as to the court might seem proper.

Plaintiff by verified reply denied that Hughes had executed the note pleaded by defendant or that he had pledged the certificate of deposit. Further replying she pleaded that on March 2, 1923. Herbert Hughes was indebted to the bank in the sum of $9000, and on said date gave to the bank his note for said amount, due six months thereafter; that one Abner Cunningham was cashier of defendant bank and that said Cunningham "requested, urged and influenced said David E. Hughes to sign said note . . . for its (the bank's) use, benefit and accommodation and without consideration, benefit or detriment accruing to or from him," further promising and agreeing that he, Cunningham, would get Luther Williams and James Baxter to sign the note, as well as Herbert Hughes, who had not yet signed; that Cunningham did get Herbert Hughes to sign, but failed to get Williams or Baxter to sign; that said note of March 2, 1923. was thereafter renewed for the same amount on September 2, 1923,

March 29, 1924, and September 29, 1924, each time without consideration as to David E. Hughes "and upon the promises and agreement aforesaid that the said above named other parties would sign said renewal notes and each of them." There are further allegations to the effect that Hughes was mentally and physically weak and relied upon Cunningham to advise him in business matters, but that question is not presented on this appeal and need not be noticed.

Plaintiff asked a jury trial, claiming that the action was one at law. The court held that defendant's answer and cross-bill converted the case into one in equity, and so tried it, refusing plaintiff's request for a jury trial. We shall dispose of this question before considering the case on the merits.

We think the court's ruling on this question was correct. The question is to be determined from the pleadings. [Ebbs v. Neff 325 Mo. 1182, 1191, 30 S. W. (2d) 616, 620; Babcock v. Rieger, 332 Mo. 528, 537, 58 S. W. (2d) 722, 725.] "Where the petition states an action at law, if the answer sets up an equitable defense and asks affirmative relief, it converts the suit at once into a suit in equity, so that the rules of equity apply. But the setting up of an equitable defense does not convert the cause into a proceeding in equity unless affirmative relief be prayed." [Ebbs v. Neff, 325 Mo. l. c. 1191, 30 S. W. (2d) 616.] Plaintiff's petition stated a cause of action at law. Defendant denied the cause of action thus tendered, but it went farther. It pleaded facts which, if proved, not only showed that plaintiff never had a cause of action but that defendant was entitled to retain possession of the certificate and also entitled to have its lien thereon and upon the money represented thereby adjudged and enforced and plaintiff's equity of redemption foreclosed,—matters of equitable cognizance. The right of a pledgee to foreclose his lien by judicial action is a well-recognized head of equitable jurisdiction. [See Cleghorn v. Minnesota Title Insurance & Trust Company (Minn.), 59 N. W. 320; Queen v. Fryer, 249 N. Y. Supp. 651; Boynton v. Payrow, 67 Me. 587; White River Savings Bank v. Capital Savings Bank & Trust Company, 77 Vt. 123, 59 Atl. 197, 107 Am. St. Rep. 754; Holt v. Guaranty & Loan Company (Ore.), 296 Pac. 852, 855; Potter v. Whitten, 161 Mo. App. 118, 129; 49 C. J., p. 1013, sec. 276; 1 Pomeroy's Eq. Jur. (4 Ed.), sec. 164, Vol. 3, sec. 1231; Schouler on Personal Property (5 Ed.), sec. 407.] Such right is said to exist even though the pledgee may have a right to proceed summarily by sale without judicial process, and to be particularly appropriate where there are conflicting claims as to the ownership and right of possession of the pledge. [49 C. J. 1014, sec. 276, supra.] In the instant case the pledgee's lien and its right to possession of the pledged property were disputed. The agreement constituting part of the note to the bank and pledging the certificate as security therefor contains a further provision by which

the makers authorize the cashier of the bank, upon default in payment of the note, "to sell said collateral or any part thereof, with or without notice, at public or private sale," but does not provide that the bank may buy at such sale. In Greer v. Lafayette County Bank, 128 Mo. 559, 574, 30 S. W. 319, it is said that the pledgee, as a general rule, cannot buy at the sale made by himself or his agent and acquire indefeasible title. Without considering whether or not the pledged property here in question is of a character such that it could properly have been sold by the pledgee under the authority given in the collateral agreement, it is most unlikely that such a sale, with the bank precluded from buying, could have resulted advantageously to either pledgor or pledgee or have protected the interests of either, particularly when the bank's claimed interest in the property and its right to sell were disputed. Under the circumstances it seems clear to us that the bank, when sued for alleged conversion of the certificate, had the right not only to defend against that suit but in the same action to assert affirmatively its interest and rights in the certificate and the fund it represented and to invoke the equity powers of the court for their determination and enforcement.

Appellant cites cases holding that a party may not invoke the aid of a court of equity when he has an adequate remedy at law. We do not think the application of that principle precludes defendant from seeking equitable relief in this case. In order to make the principle applicable the relief obtainable at law must be complete and adequate. Defendant, on the facts stated in its answer and cross-action was entitled to more than merely to defeat the plaintiff's claim of conversion or than the obtaining of a general money judgment on the note. It was entitled to have its lien on the pledged property enforced. Appellant relies strongly on Colburn v. Krenning (Mo.), 220 S. W. 834, as being in point in her favor. In that case the plaintiff sued at law for a commission due him from the defendant, and the defendant by counterclaim demanded judgment against the plaintiff for debt, asking also for enforcement of a lien on collateral which the plaintiff had pledged to him to secure the debt. This court held that the cross-action did not convert the case into a suit in equity. But it was pointed out that the matters pleaded by the defendant did not, if true, destroy the plaintiff's cause of action, a distinction again pointed out in State ex rel. Am. Cent. Ins. Co. v. Reynolds, 289 Mo. 382, 400 et seq., 232 S. W. 683. In the Colburn case, 220 S. W. 934, l. c. 937, the court said: "It may be conceded in passing that where plaintiff is asserting an action at law, if the defendant, in his answer, pleads matters of an equitable nature, and asks for affirmative equitable relief, which, if taken to be true, would destroy plaintiff's case, or show that he never had a valid cause of action, the whole case would be converted into a proceeding in equity. Under such circumstances, it is gen-

erally held that the equitable answer thus filed converts the entire action into a proceeding in equity to be tried by the court.''

In the instant case the defendant pleaded facts which, if true, destroyed plaintiff's case, showed that she never had a cause of action, and which entitled defendant to affirmative equitable relief concerning the subject matter of the alleged cause of action set up by plaintiff. It is more nearly analogous to the situation presented in Lincoln Trust Co. v. Nathan, 175 Mo. 32, 74 S. W. 1007, in which case the plaintiff's action was at law for rent claimed to be due under a lease. The defendant denied owing the rent and set up facts which if true not only destroyed the plaintiff's cause of action but entitled the defendant to affirmative relief by cancellation of the lease, which in his cross-bill he asked. It was held that the whole case was thus converted into one in equity. The Lincoln Trust Company case is cited in the Colburn case. The Colburn case and like cases cited by appellant are distinguishable on the facts involved from the case at bar. We rule this point against appellant.

On the merits appellant's principal contentions may be summed up thus: That the original $9000 note, dated March 2, 1923, was signed by David E. Hughes at the request of and solely as an accommodation to the bank and upon the promise of its cashier that he would get Williams and Baxter also to sign it; that as to Hughes it was without consideration and nonenforceable; that the subsequent notes, including that of September 29, 1924, to secure which the collateral was pledged, were merely renewals of the first and that the alleged infirmities of the original note were ''carried into and attached'' to the renewal notes, wherefore said note of September 29, 1924, was invalid and the pledge of collateral given to secure it nonenforceable.

At the time of the execution of the original note David E. Hughes and his wife lived in the little town of Dawn, two or three blocks from the bank. He owned an unencumbered farm of 160 acres, worth $16,000. His son Herbert was indebted to the bank in the aggregate of nearly $9000, unsecured, and owed some other debts. He owned a farm and considerable stock. There was some evidence tending to show that his debts exceeded his assets, other evidence that his debts about equaled the estimated value of his assets. There was also evidence that the State Finance Department had criticized the amount of the bank's loans to him and had requested the bank to reduce the loans or get security. One of the officers of the bank, shortly before March 2, 1923, had expressed the opinion to his fellow board members that Herbert's loans were too large and that security should be demanded. Other board members thought the loans all right.

Mrs. Hughes, the widow, and her two daughters, Mrs. Eunice Hughes and Mrs. Jones, testified in substance that on Saturday,

March 3, 1923, Mr. Cunningham, cashier of the bank, came to the Hughes home with the note, dated March 2d, made out but with no signatures yet attached, and asked Mr. Hughes to sign it "to accommodate the bank," telling him that the bank was being criticized by the Finance Department because of having lent so much money to Herbert, was "in quite a bit of trouble about it," and that if Mr. Hughes would sign, he, Cunningham, would have Herbert sign it and would sign it himself and get Mr. Williams and Mr. Baxter to sign it also, and that Mr. Hughes would never have to pay it; that Mr. Hughes at first refused, but finally yielded to Cunningham's persuasions and affixed his signature. The testimony of the two daughters in the main corroborated that of the plaintiff, though there were some discrepancies in the testimony of the three ladies. No explanation was offered as to why the note was dated March 2d instead of March 3d, the day on which the ladies said Cunningham came to the house and procured Hughes' signature. It conclusively appears that Mrs. Jones was not at the Hughes home on March 2d.

After her appointment as administratrix and before maturity of the note to secure which the certificate had been pledged, Mrs. Hughes, in her official capacity, demanded of the bank that it surrender to her the certificate, denying its right to hold same as security for the note. No offer to pay the note was made. On the contrary the administratrix denied her decedent's liability thereon. The note at that time, with the collateral attached, had been temporarily hypothecated to another bank for a loan made to defendant bank. That loan was paid and the note and collateral returned to defendant bank shortly after maturity of the note in question and before this suit was brought. Appellant's case is not briefed on the theory that such temporary hypothecation constituted a conversion so the evidence relative to that matter and the understanding between the banks for return of hypothecated paper for renewal or payment need not be set out.

Mr. Cunningham, for defendant, stoutly denied having gone to the Hughes home or having at any time or place made any of the representations or promises attributed to him. He testified that a few days before that note was taken, Herbert Hughes had applied for an additional loan which he, Cunningham, for the bank, had declined to make unless Herbert secured what he then owed the bank; that Herbert then went to see his father but failed to find him and asked Cunningham to speak to the elder Hughes for him; that he gave Mr. Hughes the message shortly thereafter when the latter came to the bank. (Plaintiff's evidence shows that the elder Hughes was about the bank frequently.) Cunningham said that when he told Mr. Hughes of Herbert's request for an additional loan and that the bank had declined to make it unless what he then owed was secured but would do so if Mr. Hughes would sign a new

note with Herbert for what the latter already owed, Mr. Hughes said he would think it over, and came back on March 2d and signed the $9000 note of that date; that Herbert came in and signed two or three days later, receiving whatever difference there was between his then aggregate indebtedness to the bank and the amount of the note, and that the bank then loaned Herbert, on his individual note, the additional $700 he had asked for. Mr. Cunningham testified that the note of March 2d was signed by David E. Hughes on the day of its date in the back room or director's room of the bank. Fern Elliott, an employee of the bank at that time (but not at the time of the trial), testified that on said March 2d David E. Hughes came to the bank and witness saw him go into said back room with Mr. Cunningham and when they came out Hughes left the bank and Cunningham showed him (witness) the $9000 note with Hughes' signature attached thereto. He was not permitted to state what Cunningham then told him.

Herbert Hughes testified that he went to the bank a few days before March 2, 1923, and attempted to obtain a loan of $700, which the bank consented to make only "on conditions." He was not permitted to state the conditions. After he had talked with the cashier, Cunningham, he went to see his father, whom he failed to find at home, and came back and so informed Cunningham. Plaintiff's objection to his testifying to his conversation with Cunningham was sustained. He was, however, permitted to state that he learned from Cunningham on the evening of March 2d that his father had signed the $9000 note, and when he himself signed it he got the additional $700 loan.

Evan Hughes, another son of David E., testified that on the morning of March 3d, between eight and nine o'clock,—some two hours before the time at which Mrs. Hughes and her daughters testified Mr. Cunningham came to the house and procured Hughes' signature,—he met his father who told him that he *had signed* the $9000 note, was going to help Herb out,—"was going to stay right by him."

Luther Williams testified that late in February, 1923, Mr. Hughes asked him if he had heard rumors that Herbert was threatened with bankruptcy and said to the witness "I am going down to the bank to sign that note and make it as good as any you fellows got down there;" that about six months later he told witness he had been to the bank renewing "Herb and his note at the bank" and repeated what he said in the first conversation about helping Herbert.

Mr. Baxter testified that in 1924 he had a conversation with Mr. Hughes in which the latter spoke of having signed Herbert's notes and said "they was trying to break that boy and he would spend every cent he had before he would let them do it." Both Baxter and Williams testified that they were on friendly and intimate terms with Mr. Hughes, saw and visited with him frequently, and

that he had never intimated to either of them that he had understood they were to sign the note of March 2d, or any of the renewals.

Three other witnesses testified in substance that shortly after the note of March 2d had been executed Mr. Hughes told them, severally, that he was "backing" Herbert at the bank, would back him for every dollar he was worth.

Defendant's evidence further tended to show that Mr. Hughes sold his farm to his son Evan in 1924, receiving over $9000 in cash and Evan's notes for the balance; that while negotiations relating to that sale were pending Cunningham reminded Mr. Hughes that if he sold his farm the bank would want some security on his and Herbert's note and that Mr. Hughes agreed he would deposit $9000 on time deposit and assign the certificate to the bank as collateral, which was done. That transaction was completed on June 16, 1924, on which date Mr. Hughes deposited a total of $9465.75, $9000 on time deposit for which the certificate in question was issued and pledged as above stated and the balance on checking account. The original $9000 note and the "renewal" notes were each made for six months. Herbert paid the interest, except on the last which it appears has not been paid. There was no evidence tending to show that any representations, such as that others than he and Herbert were to sign or that he would not be expected to pay, or that the note was for the accommodation of the bank, were made to David E. Hughes on the occasion of any of the renewals or when he put up the collateral. He must have known that Baxter, Williams and Cunningham had not signed the original or any renewal note. He made no inquiries as to why they had not done so, as it seems he would naturally have done had he signed with the understanding that they were to do so and for the accommodation of the bank, they being directors. Other circumstances tending to negative appellant's contention appear in the long record before us but we deem it unnecessary to lengthen the opinion by going further into detail. We have carefully examined the record and are convinced that the weight of the evidence is against the contention that the note of March 2, 1923, was signed by David E. Hughes for the accommodation of the bank or upon representations made to him that it was to be signed by others than himself and Herbert.

Defendant's evidence tends to show that the $9000 note was given and accepted as *payment* of Herbert's prior debts to the bank. But in any event if David E. Hughes signed it for the purpose of helping his son and to enable the latter to get further credit from the bank, which he thus obtained, it will hardly be contended that the note was without consideration as to the bank. And we think the weight of the evidence so shows. This conclusion renders it unnecessary to discuss appellant's further contention that the alleged invalidity of

the first note, or want of consideration therefor, was carried into and invalidated the subsequent notes including the last one. We think that as between David E. Hughes and the bank, the greater weight of the evidence shows a valid consideration for the first note.

There was much evidence introduced in an attempt by plaintiff to prove that David E. Hughes' purported signature to the last note, that of September 29, 1924, was not genuine, and evidence in rebuttal thereof by defendant. On this issue also the weight of the evidence is against plaintiff, and that contention is not advanced on this appeal. Some contention is made in appellant's brief that the court refused to permit plaintiff to prove that Herbert Hughes was insolvent when David E. signed the note of March 2d. We think this contention is not borne out by the record. While objections to certain questions along that line were sustained the witness offered to prove the alleged insolvency was finally permitted to state that in his opinion, after investigating Herbert's financial condition, the latter was insolvent. The evidence as a whole sufficiently reveals Herbert's financial condition so far as it has any material bearing on the case.

The circuit court found the issues for defendant and against plaintiff both on plaintiff's petition and on the defendant's crossbill. It rendered judgment that plaintiff take nothing by her writ, and that the defendant have and recover of plaintiff as administratrix the amount found to be due on the note, to-wit,—$12,412.50, to bear interest at seven per cent per annum, the rate specified in the note, and further adjudged and decreed foreclosure of defendant's lien on the certificate of deposit and the proceeds thereof and ordered that said certificate be sold under special execution, which it ordered issued, and that the proceeds of the sale be applied to the payment of the debt so found due the defendant. We approve the finding and judgment except that part ordering sale under execution of the certificate of deposit. The money for which the certificate was issued is in the hands of the defendant. There is no need to incur the expense of an execution sale of the certificate and the possible sacrifice of part of its value which might result at such sale. Plaintiff is entitled to have the face value of the certificate, with interest at five per cent to date of its maturity according to its terms, credited on the debt. By its terms the certificate was to draw interest only until its maturity, which was one year from its date. One year's interest amounts to $450. The judgment should therefore be modified by eliminating the portion thereof ordering sale of the certificate under special execution and in lieu thereof directing that defendant apply to payment of the amount found due it, as of the date of the original judgment, the full sum of $9,450, the face value of the certificate and interest due thereon. As so modified the judgment

of the circuit court is affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.