Robert H. SMITH, as Trustee of Reidy Marketing Company, Inc., a Debtor, Plaintiff,

v.

MARK TWAIN NATIONAL BANK and Mark Twain Bancshares, Inc., Defendants.

Robert H. SMITH, as Trustee of Reidy Marketing Company, Inc., a Debtor, Plaintiff,

v.

MARK TWAIN NATIONAL BANK and Mark Twain Bancshares, Inc., Defendants.

Nos. 83–2541C(4), 84–0031C(4).

United States District Court, E.D. Missouri.

Jan. 10, 1986.

Susman, Schermer, Rimmel & Parker, Barry S. Schermer, Thomas M. Blumenthal, St. Louis, Mo., Collins, Galloway & Smith, Robert H. Smith, Robert M. Galloway, Mobile, Ala., for plaintiff.

Husch, Eppenberger, Donohue, Elson & Cornfeld, Charles E. Merrill, Stephen D. Coffin, St. Louis, Mo., for defendants.

## MEMORANDUM OPINION

CAHILL, District Judge.

This is a consolidation of two separate causes filed by plaintiff, Robert H. Smith, trustee of Reidy Marketing Company, Inc., who brings this adversary action for the turnover of sums held by defendant Mark Twain National Bank.[1] The cause came on for trial before this Court on June 17, 1984. All uncontested facts have been stipulated to by the parties, and all briefs have now been submitted. Based on the facts as stipulated, and all papers and records herein, and upon consideration of the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact.

On August 31, 1981, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed in the United States Bankruptcy Court for the Southern District of Alabama against Reidy Marketing Co., Inc. (hereafter "debtor'). An order for relief was entered on November 11, 1981, and plaintiff (hereafter "trustee") was appointed trustee on January 19, 1982.

Defendant Mark Twain National Bank is a nationally chartered banking association with its principal place of business in St. Louis County, Missouri. From as early as 1976, defendant and debtor established and maintained a business relationship in which defendant provided financing for debtor's activities as a petroleum products broker. From time to time, defendant issued standby letters of credit in favor of debtor's suppliers and made loans to debtor to fund its' petroleum purchases; defendant relied on various certificates of deposit and repurchase agreements it issued to debtor as collateral for the credit and loans extended to debtor. Initially, debtor and defendant orally agreed that all certificates of deposit

---

1. Cause No. 83–2541–C(4) has been decided by way of summary judgment, and the Court's opinion, therefore, relates entirely to cause No. 83–0031–C(4).

and repurchase agreements issued by defendant and in defendant's possession would be collateral for credit extended by defendant. After June 1, 1981, defendant and debtor executed assignments and/or security and pledge agreements respecting certain items of collateral. On March 20, 1979, the debtor and defendant executed a security and pledge agreement. The reverse side of the agreement provided as follows:

1. As collateral security for the payment and discharge of all indebtedness, obligations and liabilities of Undersigned to Bank, howsoever created, evidenced or arising, whether direct or indirect, absolute or contingent, now or hereafter existing, due or to become due, and whether primarily, secondary, sole, joint or several, all such indebtedness, obligations and liabilities being hereinafter collectively called "Liability" or "Liabilities," Undersigned hereby grants to Bank a security interest in the following property together with all rights related thereto and with all additions thereto and substitutions therefor and the proceeds thereof (hereinafter collectively called the "Collateral"): the property described on the reverse side hereof; the property described in any other Security and Pledge Agreement executed by Undersigned; *all other property of the Undersigned of every kind and description now or hereafter and howsoever in the control and possession of Bank;* any and all property of Undersigned at any time in the control and possession of Bank, incapable of pledge or inadequately pledged; and the balance of any deposit account(s) of Undersigned with Bank at any time now or hereafter existing. Bank shall be and is hereby vested with all rights, income, revenue and profits of the Collateral including all dividends, distributions (cash or stock, extraordinary as well as ordinary), interest or other payments. Bank's consent to the receipt of dividends, distributions, interest or other payments of the Collateral by Undersigned at any time shall in no event be construed as a waiver of any Bank's rights, but shall be permissive only.

The agreement at ¶ 7 further provided:

7. Undersigned agrees that the occurrence of any of the following events shall constitute a default hereunder: (1) failure of Undersigned to pay at maturity, or at any accelerated maturity, any Liability to Bank; (2) failure of Undersigned to assign, pledge and deliver as and when demanded such additional collateral as herein provided; (3) breach or failure to perform by Undersigned of any obligation, covenant, promise or agreement contained herein or in any other agreement or contract to which Undersigned and Bank are parties; (4) the death of Undersigned; (5) any representation or statement made or furnished in any manner to Bank by or on behalf of Undersigned in connection with any Liability proves to have been false in any material respect when made or furnished; (6) any tax levy, attachment, garnishment, levy of execution or other process issued against Undersigned or the Collateral; (7) any lien or security interest filed or created against the Collateral; (8) any suspension of payment by Undersigned to any creditor, insolvency of Undersigned, any bankruptcy or insolvency proceedings or any assignment for the benefit of creditors commenced by or against Undersigned or any co-maker, accommodation maker, surety or guarantor of any Liability; (9) if Bank deems itself insecure; (10) the dissolution, merger, consolidation, or reorganization of Undersigned; (11) entry of judgment against Undersigned or any co-maker, accommodation maker, surety or guarantor of any Liability; (12) the determination by Bank that a material adverse change has occurred in the financial condition of Undersigned from the condition set forth in the most recent financial statement of Undersigned theretofore furnished to Bank, or from the condition of....

On June 1, 1981, debtor executed a promissory note in the amount of $4,000,000

payable to defendant. This note reflected defendant's promise to extend debtor a four million dollar line of credit. On June 1, 1981, defendant had in its possession debtor's certificates of deposit numbered 1694, 1738, and 1808 respectively. The total face value of these three certificates amounted to $1,525,103. Defendant also had in its possession on June 1 two repurchase agreements it had issued to debtor which together totalled $2,683,000 (exclusive of interest). On June 1, 1981, there was no amount outstanding against the line of credit.

On June 8, 1981, debtor executed a security and pledge agreement in favor of defendant. The front side of the agreement provided as follows:

Pledgor does hereby give and grant unto Bank as security for Pledgor's liability and obligations hereunder, a lien, with full right of setoff, upon any deposit or other account of pledgor with Bank and all securities and property of any kind and of whatsoever nature belonging to pledgor or in which pledgor has any right, title or interest and which, for any purpose have come into the possession, custody or control of Bank.

On June 8, 1981, debtor also executed an assignment to defendant.

During May, 1981, the debtor had incurred liability to the Louisiana Land and Exploration Company in the total amount of $3,008,917.19. On June 29, 1981, debtor executed a security and pledge agreement granting defendant a security interest in the following certificates of deposit:

| | |
|---|---|
| Certificate of deposit # 1888 | $1,500,000 |
| Certificate of deposit # 1442 | 350,000 |
| Certificate of deposit # 1466 | 175,000 |

The reverse side of the security and pledge agreement contained language identical to the March 20 and June 8 agreements. On June 30, 1981, defendant advanced debtor $3,008,917.19 under the line of credit. The debtor executed and delivered a promissory note to defendant in the same amount, $3,008,917.19. The security and pledge agreement of June 29, 1981, was executed by debtor in conjunction with the loan of

June 30, 1981. The June 29 promissory note was executed, and the loan amount of $3,008,917.19 was made by defendant to enable debtor to pay Louisiana Land and Exploration Company. On June 29 and 30, 1981, defendant had in its possession, debtor's certificates of deposit numbered 1840, 1738, and 1888 respectively. These certificates had a combined face value of $2,025,-000. On June 29, 1981, debtor executed a document assigning certificate of deposit numbered 1888 to defendant. This certificate was subsequently rolled over into certificate of deposit numbered 1960 and was in defendant's possession on June 29, 1981.

On June 22, 1981, and on each successive day thereafter through and including July 6, 1981, there were no repurchase agreements in existence between debtor and defendant. On July 7, 1981, defendant entered into a repurchase agreement with debtor in the amount of $700,000. On July 8, 1981, defendant entered into a repurchase agreement with debtor in the amount of $300,000. Both repurchase agreements remained in defendant's possession, and on July 13, 1981, they were rolled over into a single repurchase agreement in the amount of $1,000,000. On July 27, 1981, debtor entered into a repurchase agreement with defendant in the amount of $1,000,000. This repurchase agreement, order numbered 312, bore a return date of August 3, 1981. Defendant issued a confirmation and statement letter to debtor with respect to this repurchase agreement. Defendant did not have physical possession of the securities referred to in the confirmation and statement; instead, the securities remained in the possession of defendant's broker, Salomon Bros.

On July 30, 1981, certificate of deposit numbered 1978 with a face value of $250,-000 was issued by defendant. Debtor executed an assignment of this certificate of deposit dated July 30, 1981, in favor of defendant. On July 30, 1981, debtor requested defendant to wire transfer $1,350,-000 to debtor's account at Commercial Guarantee Bank in Mobile. Defendant refused to honor the request, but instead

forwarded a letter to debtor dated July 31, 1981. Debtor was advised that its request for $1,350,000 was not within the terms of its agreement with defendant for back-to-back letters of credit. Further, the letter informed debtor that defendant deemed itself insecure and had applied all funds of debtor's deposit accounts and repurchase agreement proceeds to reduce debtor's loan balance. Defendant also made demand for full payment of the balance still due and owing after its collection action.

On July 31, 1981, defendant credited the following amounts to the outstanding indebtedness of debtor:

$1,000,000, which represented funds in debtor's repurchase agreement dated July 27, 1981;

$1,777.78, which represented interest paid on the funds in the repurchase agreement of July 27, 1981;

$200,000, which represented the face amount of certificate of deposit # 1978, dated July 30, 1981;

$1,500,000, which represented the principal balance of certificate of deposit # 1960, plus interest of $5,034.24, and less a penalty of $64,726.03;

$175,000, which represented the principal balance of certificate of deposit # 1840, plus interest of $4,300.68 and less a penalty of $7,443.53;

$350,000, which represented the principal balance of certificate of deposit # 1738, plus interest of $12,791.77 and less a penalty of $12,513.70;

$8,111.78, which represented the balance total of debtor's savings and checking accounts; and

$455,176, which represented the balance in debtor's demand deposit accounts.

On August 7 and 10, 1981, two checks totaling $225,130 which had been deposited to the demand deposit account to produce the $455,176 balance of July 31, 1981, were returned marked "Stop Payment." These checks were charged back to debtor's account, and the amount actually credited to the outstanding indebtedness of debtor to defendant on July 31, 1981, was adjusted to $230,046.

On June 29, 1981, the debtor had an outstanding loan balance with the defendant of $3,981,061.62, excluding interest. On June 29, 1981, all deposit accounts and certificates of deposit placed with defendant amounted to $2,686,462.44. June 29, 1981, was the first date on which there was an "insufficiency" during the 90 days immediately preceding the filing of the bankruptcy petition.

### Conclusions of Law.

#### Set-off.

Title 11 U.S.C. § 553(a) provides:

"This title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case."

The trustee contends that defendant had no legal right of set-off since the loans by their very terms were not due nor in default until August 1, 1981. Since the bank had no right of set-off, the trustee contends that its acts with respect to debtor's accounts were wrongful and constitute a conversion.

■ "The general rule is that a bank, in the absence of express authority, may not set off the unmatured obligations of a depositor against the depositor's account whether that account is general or special." 10 Am.Jur.2d Banks, § 669 (1963). *U.S. ex rel. Crow Creek Sioux Tribe v. Tri-City Bank*, 415 F.Supp. 858 (S.D.1976); *Aetna Casualty and Surety Co. v. Atlantic National Bank of Palm Beach*, 430 F.2d 574, 577 (5th Cir.1970); *In Re Amco Products*, 17 B.R. 758 (Bkrtcy, W.D.Mo.1982). In those cases where courts have upheld a set-off to satisfy unmatured obligations, there was an express agreement allowing the bank to set off obligations when it deemed itself insecure, *e.g., Jensen v. State Bank of Allison*, 518 F.2d 1, 5 (8th Cir. 1975). At the time defendant offset against debtor's accounts, there were in existence, security and pledge agreements

giving defendant certain rights with respect to pledged collateral. Paragraph 9 of the security agreement gave defendant the right to liquidate collateral in its possession whenever it deemed itself insecure. Thus it appears that debtor's debts were mature and owing at the time of set-off as defendant had properly accelerated the due date of debtor's notes under the security and pledge agreements. *See Jensen v. State Bank of Allison, supra.* Plaintiff further argues that defendant is not entitled to set-off by reason of its failure to make prior demand before pursuing any collection action. In opposition, defendant contends the demand notes should be read in conjunction with the security and pledge agreements it executed with debtor upon each advance of money. The Court agrees with defendant's proposition, and in reading the agreements, notes that they provide for acceleration and collection without prior demand. Further, evidence in the record reveals that defendant informed debtor that if he made written demand for withdrawal of funds, his collateral would be liquidated. This was sufficient implied notice of demand conditioned upon the happening of a particular event, and defendant's set-off was proper.

Having concluded that defendant's off-set was not wrongful, the Court must now determine which accounts were available for set-off.

■ Plaintiff contends that only the demand deposit accounts were available for set-off. Plaintiff characterizes the certificates of deposit and repurchase agreement as "special accounts" not available for set-off. Defendant argues that certificates of deposit and repurchase agreements are available for set-off as they are not "special accounts." The Court agrees with defendant and concludes that the certificates of deposit and repurchase agreement are not "special accounts."

It is by now settled law that a bank cannot exercise a set-off against a deposit which is known by it to be dedicated to a special use, *e.g.*, for the sole purpose of paying taxes or meeting payrolls. *First*

*National Bank of Clinton v. Julian,* 383 F.2d 329, 337–38 (8th Cir.1967); *In Re Applied Logic Corp.,* 576 F.2d 952 (2d Cir. 1978); 4 Collier, *Bankruptcy* ¶ 68.16 at 912–13 (14th Ed.1975). "What this means is that by accepting the deposit for a special purpose the bank has agreed, at least implicitly, that the deposit should not be subject to its claims against the depositor." *In Re Applied Logic Corp., supra.* In the instant action, debtor attached no special purpose to any of the funds represented by the certificates of deposit and repurchase agreements. Moreover, defendant alleged without contradiction that it commingled the sums under the repurchase agreement with bank funds. Consequently, plaintiff's arguments relative to the unavailability of the certificates of deposit and repurchase agreements for set-off are overruled.

Because defendant failed to off-set against debtor's accounts on the first day of an insufficiency, the provisions of 11 U.S.C. § 553(b) require that defendant return the set-off. Section 553(b) provides:

(b)(1) Except with respect to a set-off of a kind described in section 362(b)(6) or 365(h)(1) of this title, if a creditor offsets a mutual debt owing to the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of—

a) 90 days before the date of the filing of the petition; and

b) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.

One court has devised the following formula for expressing the provisions of § 553(b):

debt owed by debtor less debt owed to debtor on the 90th day

minus

debt owed by debtor less debt owed to debtor on the date of setoff.

The parties have stipulated and, thus, agree that the insufficiency first arose on June 29, 1981.

On June 29, 1981—

| | |
|---|---|
| Debt owed by debtor to Bank— | $3,981.061.62 |
| Assets of debtor held by Bank— | 2,686,462.44 |
| Loan Insufficiency | $1,294,599.18 |

On July 31, 1981—date of actual set-off by Bank,

| | |
|---|---|
| Debt owed by debtor to Bank— | $4,070,823.60 |
| Assets of debtor held by Bank— | 3,382,379.10 |
| Loan insufficiency on date of set-off | $ 688,444.50 |

Improvement of Position:

| | |
|---|---|
| Loan insufficiency on first date of insufficiency | $1,294,599.18 |
| Loan insufficiency on date of set-off | 688,444.50 |
| Improvement of Bank's Position | $ 606,154.68 |

Based on the Court's computations, trustee is entitled to $606,154.68. Trustee is also entitled to prejudgment interest at nine percent (9%) per annum to be computed from July 31, 1981.

**Preference.**

 Plaintiff has also argued that defendant's June 29, 1981, loan to debtor constituted a voidable preference under 11 U.S.C. § 547. Section 547 and the case law relied on by plaintiff require a showing that defendant had reasonable cause to believe that debtor was insolvent; mere suspicion of insolvency is not enough to charge the creditor with reasonable cause to believe the debtor is insolvent. *PRS Products*, 574 F.2d 414 (8th Cir.1978); *see also Green v. A.G. Edwards & Sons, Inc.*, 582 F.2d 439 (8th Cir.1978). Moreover, the burden of proof to establish each of the elements of § 547(b) rests with the trustee. *American National Bank & Trust Co. v. Bone*, 333 F.2d 984, 987 (8th Cir.1964); *In Re Gruber Bottling Works, Inc.*, 16 B.R. 348 (Bkrtcy, E.D.Pa.1982). Plaintiff herein failed to establish that defendant had either reasonable cause to believe the debtor was insolvent on June 29, 1981, or possessed factual information which would incite a person of reasonable prudence under similar circumstances to make an inquiry into the fiscal stability of debtor. Therefore, the Court does not find a voidable

preference obtaining here with respect to the June 29, 1981, transaction.

Accordingly,

IT IS HEREBY ORDERED AND ADJUDGED that plaintiff Robert H. Smith recover from defendant Mark Twain National Bank the sum of $606,154.68 and prejudgment interest at 9% per annum from July 31, 1981.