805 F.2d 278
 15 Collier Bankr.Cas.2d 1160, 15 Bankr.Ct.Dec. 584,
Bankr. L. Rep. P 71,500, 2 UCC Rep.Serv.2d 1059
 Robert H. SMITH, as Trustee of Reidy Marketing Company,
Inc., a bankrupt, Appellee,
v.
MARK TWAIN NATIONAL BANK, Appellant.
Robert H. SMITH, as Trustee of Reidy Marketing Company,
Inc., a debtor, Appellee,
v.
MARK TWAIN NATIONAL BANK, Appellant.
Robert H. SMITH, as Trustee of Marketing Company, Inc., a
bankrupt, Appellant,
v.
MARK TWAIN NATIONAL BANK, Appellee.
Robert H. SMITH, as Trustee of Reidy Marketing Company,
Inc., a debtor, Appellant,
v.
MARK TWAIN NATIONAL BANK, Appellee.
 Nos. 86-1195, 86-1265.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 8, 1986.
Decided Nov. 5, 1986.
 
 Charles E. Merrill, St. Louis, Mo., for appellant.
 Frank Susman, St. Louis, Mo., for appellee.
 Before ROSS, WOLLMAN, and MAGILL, Circuit Judges.
 MAGILL, Circuit Judge.
 
 
 1
 Plaintiff Robert H. Smith ("Trustee"), as Trustee in Bankruptcy of Reidy Marketing, Inc. ("Debtor"), brought two separate suits based on recovery provisions of the Bankruptcy Code against defendant Mark Twain National Bank ("Bank"). Trustee sought recovery of the proceeds of certain assets liquidated by Bank, Smith v. Mark Twain National Bank, No. 84-0031-C(4) (E.D.Mo. filed Jan. 6, 1984) (the "set-off case"), and turnover of a post-petition certificate of deposit, Smith v. Mark Twain National Bank, No. 83-2541-C(4) (E.D.Mo. filed Nov. 7, 1983) (the "turn-over case"). The district court subsequently consolidated these actions and tried them in a bench trial. Bank appeals the district court's entry of judgment based on 11 U.S.C. Sec. 553(b) for $616,154.03 and the award of prejudgment interest in favor of Trustee in the set-off case, and the granting of Trustee's motion for summary judgment based on 11 U.S.C. Sec. 542 in the turnover case.[1] Trustee cross-appeals for recovery of Bank's assessment of early withdrawal penalties on certain certificates of deposit in the set-off case and for Bank's allegedly wrongfully-earned profits in both cases. For the reasons discussed below, we affirm in part and reverse in part.
 
 
 2
 I. BACKGROUND.
 
 
 3
 A. Financial Dealings.
 
 
 4
 Bank is a nationally chartered banking association with its principal place of business in St. Louis County, Missouri. From 1976 through mid-1981, Bank and Debtor maintained a business relationship in which Bank provided financing for Debtor's petroleum products brokerage business. The financing consisted of letters of credit and of loans to Debtor to fund petroleum purchases. In constructing the financing arrangements, Bank "relied on various certificates of deposit and repurchase agreements[2] it issued to [D]ebtor as collateral for the credit and loans extended to [D]ebtor." Smith v. Mark Twain National Bank, 57 B.R. 373, 374 (E.D.Mo.1986).
 
 
 5
 Initially, Bank and Debtor orally agreed that all certificates of deposit and repurchase agreements issued by Bank and in Bank's possession would be collateral for any credit extended. On March 20, 1979, however, Debtor and Bank executed the first of a series of written security and pledge agreements. The front of this agreement listed as collateral a certificate of deposit in Bank's possession on that day.[3] The reverse side of the agreement contained a clause providing for a security interest in after-acquired collateral.[4] The reverse side also contained a paragraph 7, which provided that the occurrence of certain events would constitute default, including "if Bank deem[ed] itself insecure." Mark Twain, 57 B.R. at 375.
 
 
 6
 By early 1981, Debtor had been granted a $2,500,000 line of credit from Bank, evidenced by a note from Debtor to Bank in the same amount. The note provided that "[t]he [Debtor] and all endorsers, sureties, accommodation parties, guarantors and other parties hereto waive presentment for payment, demand for payment, protest and notice of every kind and nature." On June 1, 1981, Bank increased the line of credit to $4,000,000, which was evidenced by Debtor's promissory note to Bank executed on the same day. This note contained the same language as the previous note. On June 5, 1981, Bank advanced $972,144 to Debtor on the line of credit.
 
 
 7
 On June 1, 1981, Bank had in its possession three certificates of deposit with a total face value of $2,025,000.[5] Bank also had in its possession two repurchase agreements, together totalling $2,683,000, exclusive of interest.
 
 
 8
 On June 8, 1981, Debtor executed a second security and pledge agreement in favor of Bank, the front side of which provided:
 
 
 9
 Pledgor does hereby give and grant unto Bank as security for [p]ledgor's liability and obligations hereunder, a lien, with full right of setoff, upon any deposit or other account of pledgor with Bank and all securities and property of any kind and of whatsoever nature belonging to pledgor or in which pledgor has any right, title or interest and which, for any purpose have come into the possession, custody or control of Bank.
 
 
 10
 Mark Twain, 57 B.R. at 376. Debtor also executed an assignment to Bank on June 8, 1981.
 
 
 11
 On June 29, 1981, Debtor executed a third security and pledge agreement granting Bank a security interest in the three aforementioned certificates of deposit. The reverse side of the agreement contained language identical to the two previous agreements. All of the security and pledge agreements also contained a paragraph 9, which permitted Bank to "demand, sue for, collect and/or receive money, securities or other property at any time due, payable or receivable on account of or in exchange for any such part of the collateral." On June 29, Debtor also executed an assignment of the $1,500,000 certificate of deposit to Bank.
 
 
 12
 On June 30, 1981, Bank advanced Debtor $3,008,917 on Debtor's line of credit. Bank made this advance to enable Debtor to pay one of its creditors. This transaction was evidenced by Debtor's promissory note to Bank executed on June 30 for the same amount. The June 30 note contained the same language as the two previous notes. The June 29 security and pledge agreement was executed by Debtor in conjunction with the June 30 advance.
 
 
 13
 In early July of 1981, Bank and Debtor entered into two repurchase agreements in the amounts of $300,000 and $700,000. On July 13, 1981, they were rolled over into one agreement in the amount of $1,000,000. On July 27, 1981, Bank and Debtor entered into another repurchase agreement in the amount of $1,000,000, which was in Bank's possession on July 31, 1981.
 
 
 14
 In late July of 1981, Debtor orally requested the withdrawal of $1,350,000 of its funds held by Bank. Bank "informed [D]ebtor that if he made written demand for withdrawal of funds, his collateral would be liquidated." Mark Twain, 57 B.R. at 378. Nevertheless, on July 30, 1981, Debtor, by telegram, requested Bank to wire transfer $1,350,000 to Debtor's account at a Mobile, Alabama bank. Also on that date, Bank issued a $200,000[6] certificate of deposit to Debtor, and Debtor executed an assignment of the certificate to Bank.
 
 
 15
 B. Bank's Actions on July 31, 1981.
 
 
 16
 On July 31, 1981, Bank sent Debtor a telex and a letter informing Debtor that its request of July 30, 1981, "was not within the terms of its agreement," and that Bank "deemed itself insecure" and "had applied all funds of [D]ebtor's deposit accounts and repurchase agreement proceeds to reduce [D]ebtor's loan balance." Mark Twain, 57 B.R. at 377. Further, in the telex and letter, Bank demanded full payment of the balance still due and owing after its collection action. As of this date, none of the security and pledge agreements had been cancelled or released.
 
 
 17
 In reducing Debtor's loan balance on July 31, 1981, Bank used a series of bookkeeping transactions.[7] Bank credited certain amounts, corresponding to Debtor's various accounts and assets held by Bank, to Debtor's outstanding indebtedness.[8]
 
 
 18
 On August 7 and 10, 1981, two checks totalling $225,130, which had been deposited for the same amount in Debtor's demand deposit account to produce the July 31 balance of $445,176, were returned marked "Stop Payment." These checks were charged back to Debtor's account, and the amount actually credited to Debtor's outstanding indebtedness on July 31, 1981 was adjusted to $228,158.
 
 
 19
 C. Debtor's Bankruptcy and Post-Bankruptcy Dealings.
 
 
 20
 On August 31, 1981, an involuntary petition for relief under Chapter 7 of the Bankruptcy Code was filed in the Bankruptcy Court for the Southern District of Alabama against Debtor. The court entered an order for relief on November 11, 1981, and Smith was appointed as Trustee on January 19, 1982.
 
 
 21
 On November 6, 1981, post-bankruptcy petition and pre-order for relief, Debtor wire-transferred $250,000 to Bank which, on the same day, issued a certificate of deposit in Debtor's name. On or after November 6, Bank received from Debtor a security and pledge agreement, which listed the postpetition certificate of deposit as collateral, and an assignment of the certificate. The certificate was assigned to Bank "as security and collateral for a loan of even date herewith[9] and for any other indebtedness or liabilities, present or future, absolute or contingent, direct or indirect * * *." Trustee, in a memorandum to Bank dated February 10, 1982, requested Bank to turn over the certificate of deposit. In a letter to Debtor dated February 12, 1982, Bank acknowledged receipt of Debtor's memorandum. Although Bank also indicated in its letter that turnover of the certificate would be forthcoming at some point in the future, Bank never gave the certificate to Trustee.
 
 
 22
 D. Trustee's Suits and the District Court's Decisions.
 
 
 23
 1. The Set-Off Case.
 
 
 24
 On January 6, 1984, Trustee filed a complaint against Bank in the set-off case. Trustee sought, under three different theories, to recover all or part of the approximately $3,600,000 allegedly transferred from Debtor to Bank on July 31, 1981. Count I of Trustee's complaint sought to avoid the transfer under Section 547 of the Bankruptcy Code, 11 U.S.C. Sec. 547, relating to preferential transfers, and to recover the transfer under 11 U.S.C. Sec. 550. Count II sought recovery under Section 553 of the Code, 11 U.S.C. Sec. 553, relating to set-offs. Count III sought damages on a theory of common-law conversion.
 
 
 25
 On January 10, 1986, the district court issued a memorandum opinion and judgment in favor of Trustee, ordering Bank to pay Trustee $606,154.08[10] and prejudgment interest at nine percent per annum from July 31, 1981. Mark Twain, 57 B.R. at 379. The court rejected Counts I and III, granting Trustee relief only on Count II. See id.
 
 
 26
 2. The Turnover Case.
 
 
 27
 On August 29, 1984, Trustee filed its amended complaint against Bank in the turnover case.[11] Count I of the complaint sought to avoid the transfer of $250,000 to Bank under 11 U.S.C. Sec. 549, and to recover the transfer pursuant to 11 U.S.C. Sec. 550. Count II sought turnover of the certificate of deposit, pursuant to 11 U.S.C. Sec. 542. Count III sought damages on a theory of common-law conversion. On July 16, 1985, the district court issued a memorandum and order in which the court ordered Bank to show cause why summary judgment should not be entered against it on Count II. Bank filed its response to the show cause order on August 1, 1985.
 
 
 28
 On January 10, 1986, the district court issued an order, without an opinion, granting Trustee's motion for summary judgment based on Count II of Trustee's complaint.
 
 
 29
 II. DISCUSSION: THE SET-OFF CASE.
 
 
 30
 A. Application of Section 553(b) to Foreclosure of Bank's Security Interest.
 
 
 31
 Bank contends that the district court erred as a matter of law in applying 11 U.S.C. Sec. 553(b)[12] to Bank's liquidation of Debtor's collateral. Bank asserts that it had a valid security interest in Debtor's certificates of deposit and repurchase agreements which it held as collateral, and that it properly foreclosed its security interest in that collateral. Bank further contends that section 553(b) of the Code, 11 U.S.C. Sec. 553(b), applies only to set-offs and not to valid foreclosures of security interests. Bank thus concludes that only the unsecured accounts--the checking, savings and demand deposit accounts--were subject to the insufficiency analysis under section 553(b). Accordingly, Bank maintains that the judgment award should be reduced to $228,158, the amount offset on the two checks returned marked "Stop Payment."
 
 
 32
 Under what is commonly known as the "strong-arm clause" of the Bankruptcy Code, the trustee is given the rights and powers of a judicial lien creditor as of the date of bankruptcy. 11 U.S.C. Sec. 544(a)(1). The extent of these rights and powers, however, is measured by the substantive law of the jurisdiction governing the property in question. 4 Collier on Bankruptcy p 544.02, at 544-8,-9 (15th ed. 1986) (citations omitted); see, e.g., Angeles Real Estate Co. v. Kerxton, 737 F.2d 416, 418 (4th Cir.1984). The property in this case is subject to the laws of Missouri.
 
 
 33
 Under Article 9 of the U.C.C. as adopted in Missouri, a trustee in bankruptcy becomes a lien creditor as of the date the bankruptcy petition is filed and has priority over all unperfected security interests. Mo.Ann.Stat. Secs. 400.9-301(a)(b), (3) (Vernon 1965);[13] see In re Schalk, 451 F.Supp. 268, 270 (E.D.Mo.1978), aff'd, 592 F.2d 993 (8th Cir.1979); see also In re Keidel, 613 F.2d 172, 173-74 (7th Cir.1980) (trustee in bankruptcy, as a lien creditor, is "defeated by the holder of a perfected interest."). Thus, although the district court did not address this issue, Bank's contention first requires us to determine whether it had a valid and perfected security interest in the certificates of deposit and repurchase agreement before August 31, 1981, the day the bankruptcy petition was filed.
 
 
 34
 1. Security Interest in Certificates of Deposit and
 
 
 35
 Repurchase Agreements.
 
 
 36
 Missouri's version of the U.C.C. provides that Article 9 applies to security interests created by pledge or assignment, Mo.Ann.Stat. Sec. 400.9-102(2) (Vernon 1965), and to any transaction "which is intended to create a security interest" in an "instrument." Id. Sec. 400.9-102(1)(a). Section 400.9-105(g) defines the term "instrument" as it is used in Article 9. See id. Sec. 400.9-105(g). This section provides, in relevant part, that "instrument" means "a negotiable instrument (defined in section 400.3-104) * * *." Id. Section 400.3-104's list of negotiable instruments specifically includes certificates of deposit. Id. Sec. 400.3-104(2)(c). Even where the certificate is non-negotiable, it still may be an instrument for Article 9 purposes. See id. Sec. 400.3-104(3); accord In re Dawson, 52 B.R. 444, 447 (Bankr.N.D.Ala.1984). Thus, the statutory framework of the Missouri Code clearly permits a creditor to take an Article 9 security interest in a certificate of deposit. See Washington Commercial Bank v. Bollwerk, 582 S.W.2d 695, 700 (Mo.Ct.App.1979).[14] Moreover, Missouri case law indicates that bank deposits consisting of collateral proceeds are subject to Article 9 security interests. E.g., Morris Plan Co. v. Broadway National Bank, 598 S.W.2d 557, 560 (Mo.Ct.App.1980).
 
 
 37
 Although the district court did not address whether Bank had a security interest in the certificates of deposit or repurchase agreements, it is clear from the foregoing analysis that Missouri law authorized Bank to take a security interest in Debtor's certificates, whether or not they were negotiable. The instruments were pledged, and the course of dealings between the parties indicated that they intended to create a security interest. See Mo.Ann.Stat. Secs. 400.9-102(1)(a), (2) (Vernon 1965); see also Montavon v. Alamo National Bank, 554 S.W.2d 787, 791 (Tex.Civ.App.1977) (security interest found where certificates of deposit were delivered to bank to secure a line of credit, the bank relied on the certificates in advancing credit, and the applicable provisions of the Texas Business and Commerce Code were complied with by the parties). Moreover, simply because the proceeds of the certificates were held in the form of bank deposits does not mean that they were excluded from Article 9 coverage. See Morris Plan, 598 S.W.2d at 560.
 
 
 38
 Additionally, the differences between the certificates of deposit and the repurchase agreements in this case were minor; the repurchase agreements generally had a shorter term of maturity, a higher rate of interest, a larger principal and were backed by government securities. Both instruments, however, constituted an unconditional promise by Bank to repay Debtor, and were, in substance and legal effect, promissory notes from Bank to Debtor. See Kaw Valley State Bank and Trust v. Commercial Bank of Liberty, 567 S.W.2d 710, 712 (Mo.Ct.App.1978). Further, both parties treated the two instruments similarly in this case. For these reasons, and for the limited purposes of this case,[15] we treat the repurchase agreements in the same manner as the certificates of deposit. We therefore find that both are instruments subject to security interests.
 
 
 39
 2. Security Interest in After-Acquired Collateral.
 
 
 40
 The Missouri Code permits a security agreement to provide "that collateral, whenever acquired, shall secure all obligations covered by the security agreement." Mo.Ann.Stat. Sec. 400.9-204(3) (Vernon 1965). The security interest in this after-acquired property attaches when there is agreement that it attach, value is given, and the debtor has rights in the collateral. Id. Sec. 400.9-204(1).
 
 
 41
 In this case, although the district court never expressly held that the certificates of deposit and repurchase agreements held by Bank on July 31, 1981 constituted after-acquired collateral that was subject to a security interest, the district court's factual findings logically support this conclusion. First, the court specifically found that Bank "relied on various certificates of deposit and repurchase agreements * * * as collateral for the credit and loans extended to debtor." Smith v. Mark Twain National Bank, 57 B.R. 373, 374 (E.D.Mo.1986) (emphasis added). Second, although the parties' initial agreement was oral, the court discussed and quoted from several written security and pledge agreements executed by the parties that appear to reflect the oral agreement. Specifically, the court quoted and underscored the after-acquired property clause found in paragraph 7 of the agreements. See id. at 375. These findings suggest that the court impliedly held that the security and pledge agreements granted Bank a valid security interest which attached to both the certificates of deposit and repurchase agreements as after-acquired collateral.[16]
 
 
 42
 Moreover, Trustee's assertion that the clause did not apprise Debtor of Bank's security interest in after-acquired collateral must fail. Both parties are sophisticated business entities, and the clause clearly spells out Bank's rights as to the collateral. See Drysdale v. Cornerstone Bank, 562 S.W.2d 182, 183 (Mo.Ct.App.1978) (security agreement granted bank a security interest in collateral described as "all similar property hereafter acquired"). In Drysdale, even though the debtor had no knowledge of the contents of the agreement, the Missouri Court of Appeals found "the language of the bank's security agreement is manifestly sufficient to create a security interest in after-acquired property * * *." Id. at 185.
 
 
 43
 3. Perfection of Security Interest in Collateral.
 
 
 44
 For a security interest to be enforceable against a debtor, the security agreement must be in writing and adequately describe the collateral or the secured party must have possession of the collateral. Mo.Ann.Stat. Sec. 400.9-203(1)(a), (b) (West Supp.1986). Where the secured party possesses the collateral, the possession itself may amount to perfection of the interest. See id. Secs. 400.9-302(1)(a), -304(1), -305;[17] Bollwerk, 582 S.W.2d at 700; In re Midas Coin Co., 264 F.Supp. 193, 195 (E.D.Mo.1967), aff'd, Zuke v. St. Johns Community Bank, 387 F.2d 118, 119 (8th Cir.1968) (possession of valuable United States coins as collateral amounts to perfection under Missouri Code).
 
 
 45
 Here, there is no question that Bank possessed the instruments as collateral until and on July 31, 1981. Thus, the security interest was enforceable, and was perfected long before August 31, 1981, the day the bankruptcy petition was filed against Debtor.
 
 
 46
 4. Conclusion.
 
 
 47
 Based on the foregoing analysis, we hold that Bank's security interest in the certificates of deposit and repurchase agreements has priority over Trustee's section 544(a)(1) lien. See In re Schalk, 592 F.2d 993, 996 (8th Cir.1979). This determination, however, does not end our inquiry; we must next address Trustee's contentions that Bank's foreclosure of its security interest in this particular case was invalid.
 
 
 48
 B. Validity of Bank's Foreclosure.
 
 
 49
 Trustee first contends that Bank failed to hold a sale of the collateral upon Debtor's default, as required by the security and pledge agreements. Trustee also maintains that Bank failed to give Debtor written notice before it foreclosed the collateral, as required by both the agreements and Missouri law. We address each of these contentions in turn.
 
 
 50
 1. Sale Unnecessary.
 
 
 51
 Trustee correctly quotes paragraph 7 of the security and pledge agreements as giving Bank the right "to sell any or all of the collateral at [a] public or private sale." Contrary to Trustee's argument, however, this clause does not require a sale; it merely authorizes a sale. Although the parties could have limited Bank's sole remedy in the event of Debtor's default to a sale of the collateral, see Mo.Ann.Stat. Sec. 400.9-501(1) (Vernon 1965),[18] the security agreements do not evidence this intent. To the contrary, it appears that Bank acted in a manner authorized by the Missouri Code, the express language of the agreements and Missouri case law.
 
 
 52
 Section 400.9-501(1) of the Missouri Code provides that upon a debtor's default, the rights of a secured party may be defined in the security agreement, and further, that a secured party has the right to "foreclose" its interest in the secured property. Id. Additionally, where the secured property is collateral, the Missouri Code gives a creditor the right to "dispose" of the collateral after the debtor's default, and to apply the proceeds to satisfy the secured indebtedness, id. Secs. 400.9-504(1), -501(2), either by public or private proceedings. Id. Sec. 400.9-504(3).
 
 
 53
 The Missouri Code does not delineate the specific procedure a creditor must follow to "dispose" of the collateral. Recent cases indicate, however, that where a bank holds a certificate of deposit as collateral, and where the certificate was originally issued by that bank, a formal sale is unnecessary; the bank may simply liquidate the certificate and apply the proceeds by using a set-off mechanism. See In re Nutting, 44 B.R. 233, 238 (Bankr.D.Vt.1984); Rankin v. First National Bank, 416 So.2d 738, 740 (Ala.1982); In re Herren, 10 B.R. 252, 256 (Bankr.N.D.Ala.1981). Moreover, the reasoning underlying an older Missouri case, Hughes v. Community Bank of Dawn, 336 Mo. 305, 78 S.W.2d 98 (1934), supports this result. In Hughes, the trial court decreed foreclosure of a bank's lien on a certificate of deposit, and ordered the certificate to be publicly sold with the proceeds of the sale applied to the debtor's loan balance. The Missouri Supreme Court approved the judgment, except for the part ordering a public sale of the certificate. Hughes, 78 S.W.2d at 103. The court reasoned that "[t]he money for which the certificate was issued is in the hands of the defendant. There is no need to incur the expense of an execution sale of the certificate and the possible sacrifice of part of its value which might result at such sale." Id.
 
 
 54
 In the case at bar, Bank followed the procedures permitted by the foregoing authorities. First, paragraph 9 of the agreements provides that a default occurs whenever Bank "deems itself insecure," and that Bank has the power to "collect and/or receive money, securities or other property at any time due." The district court specifically found that these powers gave Bank "the right to liquidate collateral in its possession * * *." Smith v. Mark Twain National Bank, 57 B.R. 373, 378 (E.D.Mo.1986); see also Nutting, 44 B.R. at 238 (bank bargained for, and obtained, the right to liquidate in event of default, as evidenced by language of assignment documents). Moreover, just as in Nutting, Rankin, Herren, and Hughes, Bank is the original issuer of the certificates of deposit and repurchase agreements which it held as collateral for Debtor's obligations to Bank. Public sales in this situation may not be economical to either party; the sale could result in unnecessary expenses and a loss in value of the collateral. See Hughes, 78 S.W.2d at 103. It should be noted that no such loss occurred here; Bank credited Debtor's account with the precise dollar value of the instruments on July 31, 1981.
 
 
 55
 In light of the language of the security and pledge agreements and the fact that Bank was the original issuer of the instruments it held as collateral, we hold that a sale of the collateral was not required and that Bank foreclosed its security interest in the collateral by using offsetting bookkeeping entries to dispose of the collateral and apply the proceeds to Debtor's loan balance.
 
 
 56
 2. Effect of Lack of Written Notice.
 
 
 57
 Although section 400.9-501(1) authorizes the parties to provide for the secured party's rights and remedies in the security agreement, it also forbids waiver of certain duties of the foreclosing party. See Mo.Ann.Stat. Sec. 400.9-501(1) (Vernon 1965). In particular, section 400.9-501(3)(b) reserves the creditor's duty to send notice under section 400.9-504(3), "[u]nless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market * * *." Id. Sec. 400.9-504(3)(b) (emphasis added). In cases where the listed exceptions are inapplicable, Missouri courts have interpreted section 400.9-504(3) to require written notice. E.g., Executive Financial Services, Inc. v. Garrison, 535 F.Supp. 263, 264-66 (W.D.Mo.1982), aff'd, 722 F.2d 417 (8th Cir.1983).
 
 
 58
 Bank concedes that it gave no written notice to Debtor. Nor can the waiver of notice in Debtor's notes to Bank be deemed valid in this case, in light of the prohibitions on waiver embodied in sections 400.9-501(3)(b) and 400.9-504(3). Bank contends, however, that the certificates of deposit and repurchase agreement are covered by the emphasized exception to section 400.9-504(3) or, even if they are not, the only consequence of lack of notice is a limitation on any claimed deficiency judgment, not invalidation of the foreclosure.
 
 
 59
 We are not aware of any court which has held that certificates of deposit and repurchase agreements are collateral that is "customarily sold on a recognized market." The courts that have applied this exception have dealt with collateral that consisted of corporate stock or investment securities. E.g., LeRoy v. Marquette National Bank, 306 N.W.2d 815 (Minn.1981); Marine Midland Bank-Rochester v. Vaeth, 88 Misc.2d 657, 388 N.Y.S.2d 548 (1976). We do not choose to take the bold step today to hold that the instruments here are of the type customarily sold on a recognized market, especially in light of the fact that this issue was not fully briefed by the parties. This does not preclude us, however, from discussing Bank's alternative contention.
 
 
 60
 The Missouri courts which have held that a secured creditor must give written notice pursuant to section 400.9-504(3) have done so where the claimant was seeking to obtain a deficiency judgment. E.g., Garrison, 535 F.Supp. at 264; Modern Auto Co. v. Bell, 678 S.W.2d 443, 444 (Mo.Ct.App.1984). In those cases, the courts determined that the lack of written notice precluded the claimant only from obtaining the deficiency judgment. See Garrison, 535 F.Supp. at 266; Bell, 678 S.W.2d at 445. We have not found one Missouri case, however, holding that the absence of notice under section 400.9-504(3) invalidates a foreclosure. Because there is no controlling state law on this particular issue, it is our duty to apply the rule we believe that the Missouri Supreme Court would follow. See Dabney v. Montgomery Ward & Co., 761 F.2d 494, 499 (8th Cir.1985) (citation omitted).
 
 
 61
 In this case, Bank has not sought any deficiency judgment; it is only seeking to retain the proceeds of its collateral. Therefore, cases like Garrison and Bell do not technically apply to this situation. Even if these cases do apply, however, not one of them ordered the creditor's foreclosure itself was to be invalidated; the courts only ordered that the deficiency judgment could not be recovered.
 
 
 62
 Further, although Bank's oral notice may not have strictly complied with the statute, this notice did serve to further the purpose underlying the statutory notice requirement--to apprise Debtor of Bank's possible actions so that Debtor could take whatever steps necessary to protect its interest. See Bell, 678 S.W.2d at 445. Here, however, Debtor chose to request the wire transfer regardless of this notice, knowing that Bank would take action if it did. In situations like this, it is questionable whether even written notice would serve the purpose underlying the notice requirement. We therefore conclude that if a Missouri court was faced with this particular issue, it would not order Bank's foreclosure to be invalidated.
 
 
 63
 C. Inapplicability of Section 553 to Bank's Foreclosure.
 
 
 64
 Finally, having determined that Bank's actions on July 31, 1981 amounted to a valid foreclosure of its security interest in the collateral, we now address whether the district court erred in applying 11 U.S.C. Sec. 553(b) to these actions.[19]
 
 
 65
 In bankruptcy cases, section 553 of the Bankruptcy Code, 11 U.S.C. Sec. 553, governs the set-off of mutual debts between a bankrupt debtor's estate and a creditor. Section 553(a) provides that the Bankruptcy Code is generally inapplicable to the right of a creditor to offset mutual debts that arise before the filing of the bankruptcy petition. See 11 U.S.C. Sec. 553(a). This right of set-off, however, may be limited by the "improvement in position test" found in section 553(b). See 11 U.S.C. Sec. 553(b).
 
 
 66
 Various authorities, cases and commentators have noted that the rules in section 553 "do not apply with respect to 'set-offs' that are in fact seizure of property subject to a security interest * * *." 1A Bkr.L.Ed. Sec. 6:225, at 401 (Lawyers Cooperative Publishing Co. 1981); see Rankin v. First National Bank, 416 So.2d 738, 740 (Ala.1982); In re Herren, 10 B.R. 252, 255-56 (Bankr.N.D.Ala.1981); Ahart, Alan M., Bank Setoff Under the Bankruptcy Reform Act of 1978, 53 Am.Bankr.L.J. 205, 227-29 (1979) [hereinafter cited as "Bank Setoff "]; G. Gilmore, Security Interests in Personal Property Sec. 10.7, at 315-16 (1965); but see Queenan, The Preference Provisions of the Pending Bankruptcy Law, 82 Com.L.J. 465, 474 (1977). One author states, with specific reference to banks:
 
 
 67
 To afford themselves increased protection in the event that they must setoff prior to filing, banks should consider taking consensual security interests in their customers' accounts where possible under applicable state law. [Citation omitted]. Since what was formerly a setoff could be converted into foreclosure and sale of collateral, the setoff provisions of the Code should not apply. However, such a foreclosure and sale occurring during the 90 days * * * before the filing would be subject to avoidance as a preference.
 
 
 68
 Bank Setoff, supra, at 227 (emphasis added).
 
 
 69
 We believe the rationale behind this distinction is persuasive. The drafters of section 553 "regard the right to offset as the equivalent of a perfected security interest." Id. at 210 (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 185 (1977)), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6145. If the right was unperfected, the trustee, in its role as a hypothetical judicial lien creditor, see 11 U.S.C. Sec. 544(a)(1), could set it aside; thus, there would be no need to protect this interest. Apparently, the reason that the drafters treat set-off in this manner "is that the parties intend to create a perfected interest but either cannot or, as a matter of business practice, do not, do so." Bank Setoff, supra, at 210 (citing H.R.Rep. No. 595, 95th Cong., 1st Sess. 185-86 (1977); 11 U.S.C. Sec. 506(a)). Moreover, where the interest is perfected, the trustee still is protected to the extent it can avoid the resulting foreclosure and sale as a preferential transfer under section 547 of the Bankruptcy Code, 11 U.S.C. Sec. 547.
 
 
 70
 We therefore conclude that 11 U.S.C. Sec. 553 is inapplicable to valid foreclosures of security interests.[20] Moreover, although Trustee could again attempt to avoid Bank's foreclosure of its interest as a preference under 11 U.S.C. Sec. 547, this issue has not been appealed. We note, however, that the district court specifically found that Trustee failed to meet its burden of proof on this claim. See Smith v. Mark Twain National Bank, 57 B.R. 373, 379 (W.D.Mo.1986). Because this finding does not appear to be clearly erroneous, neither a reversal nor a remand is required on this issue. See Fed.R.Civ.P. 52(a); Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).
 
 
 71
 In conclusion, we hold that on the facts of this case, Bank's actions on July 31, 1981 with respect to the certificates of deposit and the repurchase agreement constituted a valid foreclosure of its security interest in that collateral. Moreover, because we find that 11 U.S.C. Sec. 553 does not apply to valid foreclosures of security interests, we hold that the district court erred in applying section 553(b) to Bank's foreclosure of the collateral.
 
 
 72
 D. Trustee's Cross-Appeal Regarding Early Withdrawal Penalties.
 
 
 73
 Trustee argues that Bank should have credited Debtor's accounts with the amount of the early withdrawal penalties resulting from Bank's cancellation of the certificates of deposit on July 31, 1981.
 
 
 74
 Although briefed by both parties, the district court did not address this issue. We have already found, however, that Bank had a security interest in the certificates and that Bank validly foreclosed its interest. Therefore, Bank's application of the penalty proceeds becomes irrelevant to this action; although Debtor's deficiency might be adjusted, the handling of the penalty proceeds does not affect Bank's right to retain its collateral proceeds, nor does it affect Trustee's recovery of the amount offset against Debtor's unsecured accounts. Because further review of this question is unnecessary to sustain our judgment in the set-off case, we decline to address it. See Hutchinson Utilities Commission v. Curtiss-Wright Corp., 775 F.2d 231, 238 (8th Cir.1985).
 
 
 75
 E. Prejudgment Interest.
 
 
 76
 Bank contends that the district court erred in awarding interest from July 31, 1981, the date of set-off, rather than from January 6, 1984, the commencement date of this action. Because 11 U.S.C. Sec. 553 is silent on the issue of interest, Bank maintains that the rule governing interest awards in a trustee's action to recover property of the estate under 11 U.S.C. Sec. 547 should be applied to Trustee's section 553(b) recovery here.
 
 
 77
 Although case law on interest awards under section 553(b) is virtually non-existent, an analogy can be made to interest awards under other sections of the Bankruptcy Code. Under the old Bankruptcy Act and the present Bankruptcy Code, it is well-settled that interest awarded in a section 547 voidable preference action is computed from the date of demand for its return or in the absence of a demand, from the suit's commencement date. See, e.g., Kaufman v. Tredway, 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904); Palmer v. Radio Corp., 453 F.2d 1133, 1140 (5th Cir.1971); In re Independent Clearing House Co., 41 B.R. 985, 1015 (Bankr.D.Utah 1984). The rationale for the rule has been explained as follows:
 
 
 78
 The allowance of interest from the date demand is made or a proceeding instituted, rather than the date of the transfer, is based on the idea that until such time the preferred creditor cannot be said to hold the property wrongfully. * * * A transaction which results in a voidable preference is lawful when made but subject to the possibility of being defeated by subsequent events. It continues to be lawful unless it is followed by the filing of the bankruptcy petition within 90 days. It continues to be lawful after that time unless the trustee elects to avoid it. Until the trustee exercises his election and makes demand for transfer, the creditor's possession of the property is proper.
 
 
 79
 Clearinghouse, 41 B.R. at 1015.
 
 
 80
 This rationale is also applicable to actions brought under section 553(b). If a set-off occurs more than ninety days before filing of the bankruptcy petition, by its terms section 553(b) is inapplicable. If, however, a set-off occurs within the ninety-day period before filing, it is lawful under section 553(a) unless and until the trustee seeks to recover the creditor's "improvement in position," if any, under section 553(b). Until the trustee makes a demand, the creditor's retention of the benefits of a set-off is proper. If the trustee makes no demand, filing of the action is deemed to be a demand. See Kaufman, 195 U.S. at 273, 25 S.Ct. at 34.
 
 
 81
 Following this interest rule in the present case would also promote consistency in application of the Bankruptcy Code. Section 553(b)'s "improvement in position" test is derived from the preference section of the old Bankruptcy Act. 4 Collier on Bankruptcy Sec. 553.15, at 553-58 (15th ed. 1986). While it is true that section 553 of the Code preserves the common-law right of set-off, section 553(b) creates a new federal statutory right in a trustee through application of the "improvement in position" test. Because the Trustee's cause of action under section 553(b) arises under federal bankruptcy law, the award of interest should be so governed. Accordingly, we reverse the award of interest insofar as it requires payment from July 31, 1981, the date of set-off.
 
 
 82
 III. DISCUSSION: THE TURNOVER CASE.
 
 
 83
 Bank maintains that the district court erred as a matter of law in granting Trustee's motion for summary judgment and ordering turnover of the postpetition certificate of deposit to Trustee. Bank contends that the certificate is not subject to turnover under 11 U.S.C. Sec. 542 unless and until the assignment and pledge are avoided under 11 U.S.C. Sec. 549. Because the district court granted summary judgment only under 11 U.S.C. Sec. 542 and Trustee did not plead to avoid Bank's interest in the certificate, Bank argues that any attempt at this time to avoid its interest under section 549 is time-barred by 11 U.S.C. Sec. 549(d).[21]
 
 
 84
 Section 549(a) of the Bankruptcy Code, 11 U.S.C. Sec. 549(a), authorizes the trustee to avoid a transfer of estate property which was made after the commencement of the case, and not authorized by the bankruptcy court. Id. Sec. 549(a)(1), (a)(2)(B); see In re Kampen, 48 B.R. 389, 392-93 (Bankr.W.D.Mo.1984). In an involuntary proceeding, the case commences when the bankruptcy petition is filed against the debtor. See 11 U.S.C. Sec. 303(b), Rules of Bankruptcy Procedure. Moreover, in an involuntary case, when a transfer occurs after filing of the petition but before the order of relief, the trustee may avoid the transfer if it is given in satisfaction of a prepetition debt. See 11 U.S.C. Sec. 549(b); In re International Teldata Corp., 12 B.R. 879, 882 (Bankr.Nev.1981); 4 Collier on Bankruptcy p 549.03 (15th ed. 1986).
 
 
 85
 In this case, Debtor wire-transferred $250,000 to Bank on November 6, 1981, which Bank used to fund a certificate of deposit in Debtor's name. Additionally, on or about this date, Bank received the pledge and assignment documents relating to this certificate. It is clear that both of these transfers were made long after the filing of the bankruptcy petition--August 31, 1981--and without the authorization of the bankruptcy court. Therefore, any liens on the certificate created by the pledge or assignment are avoidable by Trustee under section 549(a). See 11 U.S.C. Sec. 549(a). Moreover, because the assignment stated that the certificate was collateral for a loan or an extension of credit, and because no loan or extension was ever granted, it logically follows that the transfer was given in satisfaction of Debtor's prepetition debts. Thus, Trustee could also avoid this transfer under section 549(b). See id. Sec. 549(b).[22]
 
 
 86
 Bank contends, however, that 11 U.S.C. Sec. 549(d) bars Trustee's recovery under either of the above sections. Section 549(d) provides that an action or proceeding brought under section 549 "may not be commenced after the earlier cf--(1) two years after the date of the transfer sought to be avoided; or (2) the time the case is closed or dismissed." Id. Sec. 549(d) (Supp. II 1984). In this case, the applicable time limitation period is subsection (1). The transfer in question appears to have occurred on November 6, 1981, since that is the date that appears on the pledge and assignment documents. Whether or not the date of transfer is included in the two-year computation, the latest date that Trustee could have filed his complaint was November 6, 1983.[23] Were there no other facts relevant to the delay in filing, we would be inclined to hold that section 549(d) does bar any attempt by Trustee to avoid the transfer. There are, however, a number of facts that suggest a different result.
 
 
 87
 In its letter dated February 18, 1982, Bank in effect promised Trustee that it would turn over the postpetition certificate of deposit to Trustee at some point in the future. In fact, a Bank officer admitted in his deposition, which was subsequently introduced into evidence at trial, that the certificate was properly owing to Trustee. Apparently, Trustee relied on Bank's representation; otherwise he probably would have instituted a recovery action before the two-year period expired.[24] To allow Bank to keep the proceeds of the certificate in light of the fact that Bank promised its return and admits that the certificate is owing to Trustee, would be both inequitable and unjust. Although this issue has not been placed before us, we believe that these facts make out a clear case for application of the doctrine of equitable estoppel, in order to prevent Bank from obtaining a benefit to which Trustee clearly has the superior right. See Stafford v. Ford Motor Co., 790 F.2d 702, 706 (8th Cir.1986) (appellate court may resolve an issue not passed on below where injustice might otherwise result).
 
 
 88
 Courts have invoked the doctrine of equitable estoppel to bar a defendant from asserting a statute of limitations defense where the claimant was aware of the existence of a federal cause of action, but because of the defendant's representations, the claimant failed to file an action within the act's limitations period. E.g., Glus v. Brooklyn Eastern District Terminal, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959) (late filing under Federal Employers' Liability Act, Sec. 6, 45 U.S.C. Sec. 56); Cerbone v. International Ladies' Garment Workers' Union, 768 F.2d 45 (2d Cir.1985) (late filing under Age Discrimination in Employment Act of 1967, Sec. 7(b), as amended, 29 U.S.C.A. Sec. 626(b)); Sanchez v. Loffland Brothers Co., 626 F.2d 1228 (5th Cir.1980) (late filing under Jones Act, 46 U.S.C. Sec. 688), cert. denied, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981); Bomba v. W.L. Belvidere, Inc., 579 F.2d 1067 (7th Cir.1978) (late filing under Interstate Land Sales Full Disclosure Act, Sec. 1412, 15 U.S.C. Sec. 1711).
 
 
 89
 This doctrine, however, is not applicable to the time limits of every federal statute; only where the time limits are in the nature of a true statute of limitations will it apply. In that case, the statute is a mere affirmative defense, and thus, is subject to equitable considerations such as estoppel and waiver. See, e.g., Tapper v. Commissioner, 766 F.2d 401, 403 (9th Cir.1985); EEOC v. Nicholson File Co., 408 F.Supp. 229, 232 (D.Conn.1976). On the other hand, where the time limits are jurisdictional, or where the federal act involved creates a cause of action which forces the United States to waive its sovereign immunity, the time limits are strictly construed, and equitable considerations are inapplicable. See, e.g., Hohri v. United States, 586 F.Supp. 769, 786 n. 22 (D.D.C.1984) (six-year time limit governing claims against the United States, 28 U.S.C. Sec. 2401(a)), aff'd in part and rev'd in part on other grounds, 782 F.2d 227 (D.C.Cir.1986); Stewart v. United States, 503 F.Supp. 59, 63 (N.D.Ill.1980) (Federal Tort Claims Act, 28 U.S.C. Sec. 2401(b)), aff'd, 655 F.2d 741 (7th Cir.), aff'd, 659 F.2d 1084 (7th Cir.1981).
 
 
 90
 Although we are unaware of a court specifically holding that the doctrine of equitable estoppel is applicable to the time limits in 11 U.S.C. Sec. 549(d), we believe that the doctrine does apply. The two-year limitations period sets a time frame in which an action brought under section 549 may be commenced; it has nothing to do with the jurisdiction of the United States federal courts. In fact, the district court had jurisdiction in this case under 28 U.S.C. Sec. 1332, i.e., the diversity of citizenship statute. We turn now to whether the facts in this case warrant invocation of the doctrine.
 
 
 91
 To invoke the doctrine, it is not necessary to find that Bank intentionally misled Trustee, but rather, that Trustee reasonably relied on Bank's representations in forbearing suit. See Bomba, 579 F.2d at 1071; United States v. Fidelity & Casualty Co., 402 F.2d 893, 898 (4th Cir.1968). Many courts have specifically held that a promise to pay a claim estops a defendant from asserting the limitations defense if the claimant relied in good faith on that promise. E.g., United States v. Reliance Insurance Co., 436 F.2d 1366, 1370 (10th Cir.1971); Fidelity, 402 F.2d at 897; United States v. Continental Casualty Co., 357 F.Supp. 795, 800 (E.D.La.1973).
 
 
 92
 Here, the facts indicate that Trustee did rely on Bank's representations in forbearing suit. Bank is a commercial institution, and therefore, Trustee would have ample reason to believe that Bank would keep its promise, if for no other reason than to preserve its reputation. Moreover, although the period between the communications and the filing date is lengthy, we take judicial notice of the fact that Trustee did institute a similar suit prior to the expiration of the limitations period. These facts lead us to believe that Trustee relied on Bank's promise, and, when he realized that Bank was not going to honor its promise and that the limitations period was about to expire, Trustee filed suit, albeit in a different court. The evidence here does not permit an "inference that the delay was due to factors other than [Bank's] representations and inducements." Reliance Insurance Co., 436 F.2d at 1370. To allow Bank to recover would not only be inequitable, but would set an unhealthy precedent for future cases.
 
 
 93
 We therefore hold that Bank is equitably estopped from asserting section 549(d) as a defense to Trustee's recovery, and that the transfers made by Debtor on or about November 6, 1981 are avoidable by Trustee under 11 U.S.C. Sec. 549.[25] Further, because Bank admits that the proceeds of the certificate are properly owing to Trustee under 11 U.S.C. Sec. 542, we affirm the district court's grant of summary judgment ordering turnover of the certificate based on section 542.
 
 
 94
 IV. DISCUSSION: WRONGFUL PROFITS.
 
 
 95
 Although we have reviewed Trustee's claim that Bank is wrongfully profiting from the retention of the monies invested as a result of Bank's actions on July 31, 1981 and November 6, 1981, we find that Trustee's argument lacks merit in both law and fact. Accordingly, we decline to address this issue.V. CONCLUSION.
 
 
 96
 We hold that the district court erred as a matter of law in applying 11 U.S.C. Sec. 553(b) to Bank's valid foreclosure of its security interest in the collateral, and in awarding interest from the date of set-off. Accordingly, Trustee's award is reduced to $228,158,[26] the amount offset on Debtor's unsecured accounts, and interest should accrue on this amount from January 6, 1984, the commencement date of the set-off case. We also hold that Bank is equitably estopped from asserting the 11 U.S.C. Sec. 549(d) defense and that Trustee is entitled to recover the principal balance of the postpetition certificate of deposit plus all accrued interest thereon, based on 11 U.S.C. Sec. 549 and 11 U.S.C. Sec. 542. The decision of the district court is reversed in part and affirmed in part, and judgment should be awarded consistent with this opinion.
 
 
 
 [1]
 The district court's opinion in the set-off case is reported as Smith v. Mark Twain Nat'l Bank, 57 B.R. 373 (E.D.Mo.1986). Because the turnover case was decided by way of summary judgment, there is no reported opinion
 
 
 [2]
 The certificates of deposit were written instruments issued by Bank in which Bank promised to repay the principal balance to Debtor, with interest, at the end of a specified term
 The repurchase agreements in this case involved loans of money by Debtor to Bank which Bank promised to repay, with interest, on a specified date. The repurchase agreements were backed by government securities and were generally issued for shorter terms than the certificates of deposit.
 Debtor also maintained checking, savings and demand deposit accounts at the Bank.
 
 
 [3]
 Bank maintains that this certificate was periodically rolled over into a new certificate and was one of the items held by Bank as collateral on July 31, 1981
 
 
 [4]
 Specifically, the provision read as follows:
 As collateral security for the payment and discharge of all indebtedness, obligations and liabilities of [Debtor] to Bank, howsoever created, * * * [Debtor] hereby grants to Bank a security interest in the following property together with all the rights related thereto * * *: the property described on the reverse side hereof; the property described in any other Security and Pledge Agreement executed by [Debtor]; all other property of [Debtor] of every kind and description now or hereafter and howsoever in the control and possession of Bank * * *.
 Mark Twain, 57 B.R. at 375 (emphasis supplied by district court).
 
 
 [5]
 The three certificates held by Bank had face values of $1,500,000, $175,000, and $350,000. Although the district court opinion indicated that the total face value of these certificates was $1,525,103, see Mark Twain, 57 B.R. at 376, the record shows that the value was actually $2,025,000. It appears that there may have been a miscalculation or an error in the printing of the opinion
 The record also indicates that these three certificates were periodically rolled over by Bank, and were in Bank's possession on July 31, 1981. Additionally, although the record is unclear, it appears that the certificate which was listed on the March 20, 1979 agreement was one of these three certificates.
 
 
 [6]
 Although the district court opinion, at one point, indicated that the certificate was issued in the face amount of $250,000,
 Mark Twain, 57 B.R. at 376, the record and a later part of the opinion indicate that the correct amount is $200,000. Id. at 377 ("$200,000, which represented the face amount of the certificate of deposit # 1978, dated July 30, 1981").
 
 
 [7]
 Internal memos written by bank officers used the terms "offset" and "set-off" to describe the procedure. The officers, however, in depositions and at trial, indicated that they did not know the legal significance of the terms they used, but that the terms were used to describe the "liquidation of collateral" that occurred on July 31, 1981
 
 
 [8]
 The following amounts were credited:
 Amount Representing
------ ------------
$1,000,000 Funds in Debtor's repurchase agreement
 dated 7/27/81
 1,778 Interest on above funds
 200,000 Face amount of certificate of deposit
 dated 7/30/81
 1,500,000 Principal balance of a certificate of
 deposit, plus, interest, less penalty
 175,000 Principal balance of a certificate of
 deposit, plus interest, less penalty
 350,000 Principal balance of a certificate of
 deposit, plus interest, less penalty
 8,112 Balance of Debtor's checking and
 saving accounts
 445,176 Balance in Debtor's demand deposit
 accounts
 See Mark Twain, 57 B.R. at 377. The two following facts should be noted. First, the three undated certificates of deposit--valued at $1,500,000, $175,000, and $350,000--appear to be the same three certificates held by Bank on June 1, 1981, which were subsequently rolled over and listed on the June 29, 1981 agreement. Second, the value of the demand deposit accounts listed above is correct. The district court originally stated this amount as $455,176, see id. at 377, but subsequently amended the amount to $445,176 because of mathematical error. Smith v. Mark Twain Nat'l Bank, No. 84-0031-C(4) (Order dated Feb. 3, 1986).
 
 
 [9]
 The parties have stipulated that Bank did not make a new loan to Debtor nor renew any outstanding credit as a result of the $250,000 wire transfer from Debtor
 
 
 [10]
 Upon Trustee's motion, the district court subsequently amended the original judgment to $616,154.03 because of mathematical error. Smith v. Mark Twain Nat'l Bank, No. 84-0031-C(4) (Order dated Feb. 3, 1986). Bank did not acquiesce in the judgment or the court's reasoning, but did agree that an error had been made
 
 
 [11]
 Trustee filed its original complaint in this cause of action on November 7, 1983. In that complaint, Trustee sought to recover the $250,000 transferred to Bank on November 6, 1981 under Section 549 of the Code, 11 U.S.C. Sec. 549, relating to postpetition transfers, and to recover the transfer pursuant to 11 U.S.C. Sec. 550. The district court denied Bank's subsequent motion for judgment on the pleadings, the motion having been based on the ground that the action was time-barred under 11 U.S.C. Sec. 549(d). On April 3, 1984, the court ordered the case to be consolidated with the set-off case. On August 29, 1984, Trustee filed the amended complaint in the turnover action. Unless otherwise noted, any reference to Trustee's complaint in the turnover case relates to the amended complaint
 
 
 [12]
 Section 553(b) provides:
 (1) Except with respect to a setoff of a kind described in 362(b)(6), 362(b)(7), 365(h)(2), or 365(i)(2) of this title, if a creditor offsets a mutual debt owing to the debtor against a claim against the debtor on or within 90 days before the date of the filing of the petition, then the trustee may recover from such creditor the amount so offset to the extent that any insufficiency on the date of such setoff is less than the insufficiency on the later of--
 (A) 90 days before the date of the filing of the petition; and
 (B) the first date during the 90 days immediately preceding the date of the filing of the petition on which there is an insufficiency.
 (2) In this subsection, "insufficiency" means amount, if any, by which a claim against the debtor exceeds a mutual debt owing to the debtor by the holder of such claim.
 11 U.S.C. Sec. 553(b) (1982 & Supp. II 1984). Section 553(b) permits a trustee to recover any amount offset by a bank against a debtor's accounts that represents an improvement in position between the date of set-off and the first date of insufficiency during the ninety days before filing of the bankruptcy petition. See id; 4 Collier on Bankruptcy p 553.15, at 553-59 (15th ed. 1986).
 In this case, the district court applied section 553(b) to Bank's actions on July 31, 1981 with respect to all of Debtor's accounts held by Bank. See Mark Twain, 57 B.R. at 378-79. Bank's contention raises the question of whether this section should have been applied only to Debtor's unsecured accounts--the checking, savings, and demand deposit accounts.
 
 
 [13]
 The statute provides in relevant part:
 (1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of * * * (b) a person who becomes a lien creditor without knowledge of the security interest and before it is perfected;
 * * *
 (3) A "lien creditor" means a creditor who has acquired a lien on the property involved by attachment, levy or the like and includes * * * a trustee in bankruptcy from the date of the filing of the petition * * *.
 Mo.Ann.Stat. Secs. 400.9-301(1)(b), (3) (Vernon 1965) (emphasis added.)
 
 
 [14]
 Many of Trustee's arguments in this case are based on its contention that certificates of deposit are excluded from Article 9 coverage in Missouri. No Missouri court, however, has ever held as such. In fact, many Missouri cases have involved security interests in certificates of deposit, see, e.g., Washington Commercial Bank v. Bollwerk, 582 S.W.2d 695 (Mo.Ct.App.1979), which implies that this issue is so well-settled that it needs no discussion
 Furthermore, Trustee's reliance on In re Amco Products, Inc., 17 B.R. 758 (Bankr.W.D.Mo.1982), rev'd, 50 B.R. 723 (W.D.Mo.1983), is misplaced. Trustee misinterprets the language in Amco Products in concluding that that court impliedly held that certificates of deposit are excluded from Article 9 coverage. Although it is true that Article 9 does not apply to "any deposit, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organizaiton," Mo.Ann.Stat. Sec. 400.9-104(k) (Vernon 1965) (emphasis added), the language in Amco Products actually suggests that certificates of deposit are not "deposits" under section 400.9-104(k) and are subject to Article 9 coverage. See Amco Products, 17 B.R. at 761.
 
 
 [15]
 We do not purport to hold that every repurchase agreement is covered by Article 9 of the Missouri Code. No Missouri court has addressed this specific issue; nor has the issue been fully briefed. In this case, however, it is clear that the similarities between the repurchase agreements and the certificates, in addition to the fact that both parties treated them similarly, leads to the conclusion that we should handle them in the same manner
 
 
 [16]
 Trustee asserts that this court is bound by "the law of the case" with respect to the following statement by the district court in a pretrial memorandum and order: "[T]he June 8 and 29 security and pledge agreements do not by their express terms grant a security interest in after-acquired property * * *." Smith v. Mark Twain Nat'l Bank, No. 83-2541-C(4) (Pretrial Order dated July 16, 1985). Trustee's contention, however, is flawed for a number of reasons. First, this memorandum and order was issued with respect to the turnover case. The court's statement was made in the context of whether the post petition certificate of deposit was covered by the agreements, not whether the agreements covered pre petition instruments. Moreover, in the district court's post-trial order dated January 10, 1986 in the turnover case, the court specifically stated that its earlier assertion was erroneous, because the agreements provided that Bank "was to enjoy a security interest in after-acquired property." Second, the evidence presented at trial indicates that the certificates of deposit and repurchase agreements were collateral, and the district court's factual findings in its memorandum opinion dated January 10, 1986, appear to recognize this status. Finally, the "law of the case" does not apply to issues not decided by final judgment. See Day v. Amax, Inc., 701 F.2d 1258, 1263 (8th Cir.1983)
 
 
 [17]
 These sections provide in relevant part:
 (1) A financing statement must be filed to perfect all security interests except the following:
 (a) a security interest in collateral in possession of the secured party under section 400.9-305 * * *.
 Mo.Ann.Stat. Sec. 400.9-302(1)(a) (West Supp.1986).
 A security interest in instruments * * * can be perfected only by the secured party's taking possession, except as provided in subsections (4) and (5).
 Id. Sec. 400.9-304(1) (Vernon 1965). The two excepted sections are inapplicable to this case.
 A security interest in * * * instruments * * * may be perfected by the secured party's taking possession of the collateral * * *.
 Id. Sec. 400.9-305.
 
 
 [18]
 Section 400.9-501 provides:
 (1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this part and except as limited by subsection (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure.
 Mo.Ann.Stat. Sec. 400.9-501(1) (Vernon 1965).
 
 
 [19]
 Bank does not dispute the district court's application of 11 U.S.C. Sec. 553(b) to Debtor's checking, savings, and demand deposit accounts. It is clear that Article 9 does not apply to these accounts. See Mo.Ann.Stat. Sec. 400.9-104(k) (Vernon 1965). Therefore, the only right Bank had with respect to these accounts was the common-law right of set-off. See, e.g., In re Amco Products, Inc., 17 B.R. 758, 762 (Bankr.W.D.Mo.1982), rev'd on other grounds, 50 B.R. 723 (W.D.Mo.1983); 4 Collier on Bankruptcy p 553.15 (15th ed. 1986)
 
 
 [20]
 Although the district court did not discuss its reasons for applying section 553(b) to Bank's collateral, it may have felt that because the terms "offset" and "set-off" were used by Bank officers in internal Bank memoranda, or because Bank's foreclosure of its interest involved offsetting bookkeeping entries, Bank's actions constituted a set-off. A court, however, should not rely entirely on the terms used to describe the foreclosure procedure, especially when the terms are used by non-lawyers who do not recognize the legal significance of the terms. See Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1250 n. 8 (3d Cir.1983), cert. dismissed, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984). Rather, the court should focus on the economic reality of the situation; many courts have allowed banks to use a set-off mechanism to foreclose a security interest. E.g., Rankin v. First Nat'l Bank, 416 So.2d 738, 740 (Ala.1982); In re Herren, 10 B.R. 252, 256 (Bankr.N.D.Ala.1981)
 Additionally, although the security agreement provided for a "full right of setoff," Bank was not required to set-off, since the parties did not limit Bank's rights and remedies solely to the right of set-off. See Mo.Ann.Stat. Sec. 400.9-501(1) (Vernon 1965).
 
 
 [21]
 In its reply brief, Bank admits that the certificate "would be owing to the Trustee were it not for the provisions of 11 U.S.C. Sec. 549(d)."
 
 
 [22]
 Although the district court did not issue an opinion in its January 10, 1986 order, the court did discuss this issue in its memorandum and show cause order dated July 16, 1985. In fact, the court concluded that the postpetition transfer "was executed by debtor to satisfy a pre-petition obligation," Smith v. Mark Twain Nat'l Bank, No. 83-2541-C(4) (Memorandum and Show Cause Order dated July 16, 1985), in violation of section 549(b)
 
 
 [23]
 If the day of transfer is included in the computation, the last date the action could have been brought was Saturday, November 5, 1983. If it is not included, then the two years expired on Sunday, November 6, 1983. Under either computation, a strict reading of 11 U.S.C. Sec. 549(d)(1) indicates that Trustee's original complaint, which was filed on November 7, was untimely. Although Trustee argues that Fed.R.Civ.P. 6(a) permits an extension of the two-year limitations period in section 549(d), we do not reach this question today
 
 
 [24]
 This presumption is buttressed by the fact that Trustee did file an action against Bank in the United States Bankruptcy Court for the Southern District of Alabama on November 1, 1983, seeking turnover of the same assets. Smith v. Mark Twain Nat'l Bank, No. 83-0492 (Bankr.S.D.Ala. filed Nov. 1, 1983). Although the suit was dismissed for reasons unknown to this court, it clearly was instituted within the limitations period of 11 U.S.C. Sec. 549(d). Additionally, although the district court record does not indicate whether that court had knowledge of this action, there can be no question that this court may take judicial notice of the filing
 
 
 [25]
 Although the issue of equitable estoppel was not raised in the district court, nor did the district court's judgment rest on 11 U.S.C. Sec. 549, we point out the well-settled rule that an appellate court has the power to affirm the judgment below on any ground supported by the record. See, e.g., Reeder v. Kansas City Bd. of Police Comm'rs, 733 F.2d 543, 548 (8th Cir.1984)
 
 
 [26]
 Under the "improvement in position test" of 11 U.S.C. Sec. 553(b), the insufficiency calculation results in an amount of $616,155. The Trustee is entitled to recover "the amount so offset" to the extent of this insufficiency. See 11 U.S.C. Sec. 553(b)(1). Thus, Trustee is entitled to $228,158--the amount offset against the unsecured deposit accounts